UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BHAMIN CHHATRAPATI,<br><br>Defendant | ) Criminal No.  26cr10181<br>)<br>) Violation:<br>)<br>) <u>Count One:</u> Conspiracy to<br>) Commit Health Care Fraud<br>) (18 U.S.C. § 1349)<br>)<br>) <u>Forfeiture Allegation:</u><br>) (18 U.S.C. § 982(a)(7))<br>) |

<u>INFORMATION</u>

At all times relevant to this Information:

<u>General Allegations</u>

*The Defendant*

1.      Defendant BHAMIN CHHATRAPATI ("CHHATRAPATI"), a resident of Stoughton, Massachusetts, was the owner, manager, and operator of DME Expert Care, LLC ("Expert Care").

*Related Entities*

2.      Expert Care was a Massachusetts limited liability company based in Walpole, Massachusetts. Expert Care was a supplier of durable medical equipment ("DME"), such as orthotic braces, to Medicare beneficiaries.

3.      Pharmagears, LLC ("Pharmagears") and RR Medco, LLC ("RR Medco") were DME companies owned by co-conspirator Raju Sharma.

4.      Marketer 1 and other co-conspirator marketers (collectively, the "Marketers") were companies in the business of obtaining and using Medicare beneficiary information to generate

and sell doctors' orders for DME to DME companies—including Pharmagears, RR Medco, and Expert Care—through mass-telemarketing.

*The Medicare Program*

5.     Medicare was a federally funded health insurance program affecting commerce that provided health care benefits to persons who were 65 years of age and older or disabled. The benefits available under Medicare were governed by federal statutes and regulations.

6.     Medicare was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b).

7.     The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

8.     Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary had a unique Medicare identification number.

9.     Health care providers—including doctors, nurses, and medical supply companies— obtained Medicare National Provider Identifiers ("NPIs"), which were unique to each provider.

10.    Medicare included coverage under component parts. Medicare Part B covered, among other things, physician services, outpatient care, and DME.

11.    To participate in Medicare, providers, including DME companies, had to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider an NPI. A health care provider with an NPI could submit claims to Medicare to obtain reimbursement for medical items and services provided to beneficiaries.

12.     Enrolled providers agreed to abide by the policies, procedures, rules, and regulations governing Medicare reimbursement. To receive Medicare funds, enrolled providers were bound to abide by the federal Anti-Kickback Statute and other laws and regulations.

13.     To bill Medicare for items provided or services rendered to a beneficiary, a provider submitted a claim form (Form 1500). To be approved, a Form 1500 had to contain true and accurate information and be for medically necessary items or services.

*Durable Medical Equipment*

14.     DME was reusable medical equipment, such as orthotic devices, walkers, canes, and hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces.

15.     Medicare reimbursed DME providers for medically necessary items and services provided to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company. Claims submitted to Medicare for the reimbursement of DME contained, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and NPI of the provider who prescribed or ordered the equipment.

16.     A claim for DME submitted to Medicare qualified for reimbursement only if it was ordered for the beneficiary by a participating provider who certified that the DME in question was "reasonable and necessary" for the treatment of the beneficiary's illness or injury.

17.     Medicare referred to prescriptions for DME as "orders."

## Overview of the Conspiracy

18.     From in or around February 2023 and continuing through in or around September 2024, CHHATRAPATI, Sharma, and others known and unknown to the United States Attorney conspired to commit health care fraud by: working with telemarketers or call centers to obtain medical information from or about Medicare beneficiaries; using that information to prepare medical documentation, including orders for DME, for Medicare beneficiaries that made it appear that medical practitioners had legitimately prescribed DME to these beneficiaries and that the prescribed DME was medically necessary; submitting fraudulent claims to Medicare for orders for DME; receiving reimbursement from Medicare for these DME orders; and paying the telemarketers per brace order approved by Medicare. These orders were medically unnecessary, based on false documentation, tainted by kickbacks and bribes, and otherwise not covered by Medicare. Medicare would have denied these claims had it known the process by which CHHATRAPATI and his co-conspirators generated the claims.

19.     For dates of service between approximately June 2023 and September 2024, CHHATRAPATI and his co-conspirators caused Expert Care to submit a total of approximately $5.1 million in false and fraudulent claims for DME to Medicare, for which Medicare paid Expert Care approximately $2.6 million.

## Object and Purpose of the Conspiracy

20.     The object of the conspiracy was to commit health care fraud, that is, to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money or property owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care

4

benefits, items, and services, by submitting, willfully causing the submission, and aiding and abetting in the submission of materially false and fraudulent claims, including claims tainted by kickbacks and bribes, for DME that was not medically necessary and not legitimately prescribed.

21.    The principal purpose of the conspiracy was for CHHATRAPATI and his co-conspirators to unlawfully enrich themselves by, among other things: (a) obtaining signed provider orders (and related beneficiary medical records and documentation) for braces that were not medically necessary, not eligible for reimbursement, not actually signed by providers, and/or not provided to beneficiaries as represented by offering and paying kickbacks and bribes in exchange for these orders; (b) submitting and causing the submission of false and fraudulent claims to Medicare; (c) concealing and causing the concealment of these false and fraudulent claims; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means of the Conspiracy

22.    Among the manner and means by which CHHATRAPATI and co-conspirators known and unknown to the United States Attorney carried out the conspiracy were the following:

a.  enrolling Pharmagears, RR Medco, and Expert Care in Medicare and, in so doing, falsely certifying to Medicare that they would comply with all Medicare-related laws and regulations, including the federal Anti-Kickback Statute;

b.  agreeing to pay, and paying, kickbacks and bribes to the Marketers to obtain completed and signed orders for braces (and related beneficiary medical records and documentation) that were not medically necessary and not eligible for Medicare reimbursement;

c.  obtaining Medicare beneficiary information from the Marketers, who, using

international call centers, called beneficiaries and misled, up-sold, or otherwise pressured the beneficiaries to accept braces that call center employees marketed as free or low-cost;

d.  concealing these illegal kickbacks and bribes by creating and executing sham contracts with the Marketers which appeared to require Pharmagears, RR Medco, and Expert Care to pay the Marketers on a flat fee basis or at an hourly rate and issuing and accepting sham invoices purporting to show that payments from Pharmagears, RR Medco, and Expert Care to the Marketers were calculated based on that flat fee or hourly rate when, in fact, CHHATRAPATI and his co-conspirators made payments to the Marketers on a per-brace-order basis;

e.  maintaining and sharing between Pharmagears, RR Medco, and/or Expert Care, on one hand, and the Marketers, on the other, spreadsheets and other documents which captured the kickbacks and bribes that Pharmagears, RR Medco, and Expert Care paid to the Marketers for the doctors' orders;

f.  using doctors' or other providers' NPIs without the providers' knowledge or authorization to submit orders for DME when, in fact, these providers had not actually signed the orders and/or had no treating relationship with the beneficiary;

g.  submitting or causing the submission of false and fraudulent claims to Medicare for DME orders that were: (i) induced through kickbacks and bribes; (ii) designed for maximum reimbursement and regardless of medical need; (iii) not medically necessary; (iv) not properly prescribed by a medical practitioner;

6

and/or (v) not otherwise eligible for reimbursement;

h.  concealing the submission of these false and fraudulent claims to Medicare;

i.  diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud; and

j.  opening new DME companies with new names and new principals when CMS placed Pharmagears, RR Medco, and/or Expert Care on payment suspension.

<u>Acts in Furtherance of the Conspiracy</u>

23.    From in or around February 2023 through in or around September 2024, CHHATRAPATI and co-conspirators known and unknown to the United States Attorney committed and caused to be committed the following acts, among others, in furtherance of the conspiracy:

a.  In or around February 2023, after CMS issued payment suspensions for Pharmagears and RR Medco based on credible allegations of fraud, Sharma recruited CHHATRAPATI to open a new DME company in the model of Pharmagears and RR Medco.

b.  On or about March 23, 2023, CHHATRAPATI organized Expert Care as a limited liability company in Massachusetts.

c.  On or about June 13, 2023, CHHATRAPATI enrolled Expert Care in Medicare.

d.  On or about August 30, 2023, CHHATRAPATI and his co-conspirators caused Expert Care to begin submitting claims for DME to Medicare.

e.  On or about March 18, 2024, CHHATRAPATI and his co-conspirators caused Expert Care to bill Medicare approximately $1,860 for two knee braces with

7

suspension sleeves for beneficiary G.R. The doctor whose signature appeared on the order did not prescribe the braces for G.R. This same doctor was also listed as the prescribing physician for DME orders for nine other beneficiaries billed by Pharmagears, RR Medco, and Expert Care, and the doctor did not prescribe the DME for any of those beneficiaries either.

f.  On or about March 18, 2024, CHHATRAPATI and his co-conspirators caused Expert Care to bill Medicare approximately $1,091 for a back brace for beneficiary R.H., who was in his/her late 60s at the time. The doctor whose signature appeared on the order was a pediatric orthopedic specialist and did not prescribe the braces for R.H. This same doctor was also listed as the prescribing physician for DME orders for nine other beneficiaries billed by Pharmagears and Expert Care, and the doctor did not prescribe the DME for any of those beneficiaries either.

g.  On or about April 29, 2024, CHHATRAPATI forwarded Marketer 1 an email from Expert Care's third-party billing company notifying CHHATRAPATI of Medicare's denial of two claims and related refund requests. CHHATRAPATI requested that Marketer 1 "adjust this on our next billing" so as not to reflect any kickback or bribe payment for those two claims.

h.  On or about April 30, 2024, CHHATRAPATI and his co-conspirators caused Expert Care to bill Medicare approximately $2,951 for a back brace and two knee braces with suspension sleeves for beneficiary M.E., who was an adult in his/her 70s at the time. The doctor whose signature appeared on the order was a child psychiatrist and did not prescribe the braces for M.E.

8

i.  On or about June 11, 2024, CHHATRAPATI and his co-conspirators caused Expert Care to bill Medicare approximately $2,951 for a back brace and two knee braces with suspension sleeves for beneficiary D.D. The doctor whose signature appeared on the order was a cardiologist and did not prescribe the braces for D.D.

## COUNT ONE
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

The United States Attorney charges:

24.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-23 of this Information.

25.     Beginning in or around February 2023 and continuing through in or around September 2024, in the District of Massachusetts, and elsewhere, the defendant,

### BHAMIN CHHATRAPATI,

knowingly and willfully conspired with others known and unknown to the United States Attorney to commit health care fraud, that is, to knowingly execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program Medicare, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1349.

FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

26.     Upon conviction of the offense in violation of Title 18, United States Code, Section 1349, set forth in Count One, the defendant,

BHAMIN CHHATRAPATI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. The property to be forfeited includes, but is not limited to, the following assets:

    a.  $282,732.61 seized on or about September 4, 2024, from JP Morgan Chase Bank account ending in 0160 held in the name of Expert Care.

27.     If any of the property described in Paragraph 26, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendant --

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 26 above.

11

All pursuant to Title 18, United States Code, Section 982(a)(7).

LEAH B. FOLEY
United States Attorney
District of Massachusetts

SARAH B. HOEFLE
LAUREN A. GRABER
Assistant United States Attorneys
District of Massachusetts

June 22, 2026